**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

SERVICIOS ESPECIALES AL COMERCIO EXTERIOR,

        Plaintiff,

v.                                             Case No. 08-CV-1117

JOHNSON CONTROLS, INC.,

        Defendant.

---

## ORDER

On April 4, 2011, defendant Johnson Controls, Inc. ("JCI") filed a Rule 7(h) Expedited Non-Dispositive Motion for Reconsideration (Docket #99).[1] JCI's motion requests reconsideration of the court's finding in its April 1, 2011 Order (Docket #98) that a genuine dispute remained as to whether a number of the invoices at issue in this case are non-actionable due to the statute of limitations. As such, the court denied summary judgment on that issue. More specifically, JCI now contends that the affidavit of an employee offered to oppose summary judgment by plaintiff Servicios Especiales al Comercio Exterior ("Servicios") was in fact a sham affidavit that should not have precluded entry of summary judgment.

Because JCI's further submissions here do not establish that the affidavit was a sham, and because the court's finding would stand independent of the alleged

---

[1] The court begins by noting that Civil Local Rule 7(h) permits (as reflected by the title of the motion) expedited motions seeking "non-dispositive" relief. Civil L. R. 7(h)(1). It would seem that, given that the reconsideration requested would in fact result in the grant of JCI's earlier *dispositive* partial summary judgment motion, this rule may not be the proper vehicle for such a request. However, the issue is simple and easily disposed of, so the court addresses it nonetheless.

sham affidavit, the court is obliged to deny JCI's motion.  The sham affidavit rule prevents a party from defeating summary judgment through a declaration or affidavit contradicting prior testimony.  *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir. 1996).  The key is looking to whether the statement is "inherently inconsistent" or "so squarely contradicts an earlier one as to create only a sham issue of fact."  *Id.* at 1169, 1170.  Further, when offered to oppose a motion for summary judgment, an affidavit must be made on personal knowledge.  Fed. R. Civ. P. 56(c)(4).

JCI now argues that the affidavit of Alfredo de Jesus Dominguez Rodriguez ("Dominguez"), asserting personal knowledge as to the terms of the oral contract at issue, was a sham.  In Dominguez's declaration, he asserted that he had personal knowledge of the terms of the oral contract and that a fifteen-day payment window was not a term.[2]  (Dominguez Rodriguez Decl. ¶¶ 4, 7-9) (Docket #84).  In order to establish Dominguez's contradiction, JCI submits portions of his earlier deposition, a relevant portion of which follows:

> Q . . . Do you see in Servicios' answer to Interrogatory No. 2 that Servicios responded that, "Servicios had an oral contractual agreement with JCI and JCAM where Servicios provided financial, logistical and technical services to JCI and JCAM." Do you see that?
>
> A Yes.

---

[2]The existence of a fifteen-day payment window is material to the issue of whether the statute of limitations bars action on the vast majority of unpaid invoices subject to this action. For further factual background, see the court's April 1, 2011 Order (Docket #98).

Q   Would you describe the oral contractual agreement referenced in the answer to Interrogatory No. 2?

MR. RAMIREZ: Objection, calls for a legal conclusion. Subject to that, go ahead and answer.

THE WITNESS: The oral contract is an agreement with a client to undertake all of the agreement that is mentioned here. In the specific case of this business, our original client was Keiper of Mexico.

At one point they were contacted or that is, the job was undertaken by Francisco King Hernandez. That was the point at which the contract arose. I wasn't present. This I know through my boss.

This particular system of work, that oral contract was in existence when Johnson Controls bought Keiper of Mexico. We continued working with them in the normal fashion, and nothing changed.

. . .

Q   Who from JCI, from Johnson Controls, Incorporated, made the oral contractual agreement referenced in interrogatory - - in Servicios' answer to Interrogatory No. 2?

MR. RAMIREZ: Objection, calls for a legal conclusion. Subject to the objection, go ahead and answer.

THE WITNESS: I do not know that. I don't know that information now.

BY MR. JOHNSON:

Q   So as the corporate designee of Servicios, you do not know who from Johnson Controls entered into the oral contractual agreement referenced in Servicios' answer to Interrogatory No. 2?

A   Yes, because I was not present.

Q   So does that mean that no one within your company, within Servicios knows who from Johnson Controls made the oral contractual agreement?

A   No. I simply said that I was not present. I would imagine that my boss, Francisco King Cancino, would know that.

Q   So Mr. King Cancino knows who from Johnson Controls, Incorporated made the oral contractual agreement referenced in Servicios' answer to Interrogatory No. 2?

A   Yes.

. . .

Q   And so as you sit here today as the corporate designee of Servicios, you cannot tell me who from JCI entered into the oral contractual agreement referenced in Servicios' answer to Interrogatory No. 2?

A   That's correct. I don't remember exactly the name of the person.

Q   Do you know the date that the oral contractual agreement was made?

A   Not the exact date. Supposedly it was done in 1996.

Q   Do you know where you made it, like the physical location?

A   Yes.

   . . . THE WITNESS: In Tlaxcala, that's where the physical plant is.

. . .

Q   I understand. And what were the terms of the agreement?

A   The general terms were concerning operations of import and export. Through our corporation, the payment of taxes and also inherent expenses within - -

   . . . THE WITNESS: - - and also costs that were inherent to our cargo, our merchandise.

BY MR. JOHNSON:

Q   And how did the agreement work?

> A    We would, first of all, carry out inspection of merchandise. They were informed of the costs of expenses and taxes. And then when these would come into the country, we were permitted to pay for these costs ahead of time. And then by means of a follow-up bill, we were reimbursed for these charges as well as for our fees.
>
> . . .
>
> Q    So it was kind of like a revolving account?
>
> A    Yes.

(Dominguez Rodriguez Dep. 18:16-19:18, 22:2-23:2, 24:1-24:18, 25:10-26:11) (Docket #99-2). JCI argues that Dominguez's declaration of personal knowledge contradicts this earlier testimony because at his deposition he testified that he was not present during the making of the alleged oral contract. Thus, JCI argues, Dominguez could not possibly have personal knowledge of the contract's terms. However, JCI's argument is overly black and white. Dominguez's declaration of personal knowledge does not squarely contradict his deposition. A contextual reading of the deposition reveals that it does not unambiguously establish a lack of knowledge as to the alleged contractual terms. Rather, it simply establishes that he was not present at the contract's creation. That does not necessarily preclude a person from knowledge of the terms. It is no more necessary that a person operating under an oral contract be present at its creation than a person operating under a written contract in order to hold knowledge of the terms. JCI alludes to a counter argument here by citing the proposition that a witness must have "sense data" about the matter in order to have personal knowledge, citing *Unterreiner v.*

*Volkswagen of Am., Inc.*, 8 F.3d 1206 (7th Cir. 1993). That citation is only half the story, however. The court's statement involved a slightly longer quotation from another Seventh Circuit case, stating that "[p]ersonal knowledge . . . includes . . . *inferences* from sense data as well as sense data themselves." *Id.* at 1211 (citing *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989) (emphasis added)). In turn, the *Palucki* court drew its rule from another case in which the court briefly explored the philosophical underpinnings of human knowledge. As the court explained:

> All perception is inferential, and most knowledge social; since Kant we have known that there is no unmediated contact between nature and thought. Knowledge acquired through others may still be personal knowledge within the meaning of Fed. R. Evid. 602, rather than hearsay, which is the repetition of a statement made by someone else- a statement offered on the authority of the out-of-court declarant and not vouched for as to truth by the actual witness. Such a statement is different from a statement of personal knowledge merely based, as most knowledge is based, on information obtained from other people.

*Agfa-Gevaert, A.G. v. A.B. Dick Co.*, 879 F.2d 1518, 1523 (7th Cir. 1989). In Dominguez's declaration, he asserts not just that he has personal knowledge of the terms, but that he gained that knowledge during the course of his employment. (Dominguez Rodriguez Decl. ¶ 4). Thus, Dominguez's absence at contract formation does not establish a lack of personal knowledge which he later contradicts in his declaration.[3]

---

[3] This line of reasoning applies equally to JCI's brief contention that "[t]o the extent [Dominguez] learned anything about the terms . . . it was through his boss Mr. King." (Def.'s Mot. to Reconsider 3) (Docket #99).

JCI argues that Dominguez's deposition testimony reveals that he has no knowledge of the terms because "he could not answer questions about the specific terms," rather only giving "a general description of the services" provided. (Def.'s Mot. to Reconsider 3 n.2) (Docket #99). But a full reading of the offered deposition excerpts reveals that counsel for JCI never actually asked about specific terms. Counsel asked only what the terms were, to which Dominguez responded with the "general terms." Counsel then followed up by asking how the agreement worked. Dominguez again gave an overview. But he was never asked whether he knew whether there was a solid payment window, or otherwise pressed on specifics in a way that reveals a lack of personal knowledge. While JCI may ultimately be able to convince a jury to disregard Dominguez's characterization of the payment terms, that goes to the weight of the evidence, which is not a proper consideration on summary judgment. In total, Dominguez's deposition testimony simply does not assert a clear lack of knowledge, which his later declaration squarely contradicts.

Further, even if Dominguez's declaration fell afoul of the sham affidavit rule, the remainder of the court's analysis was sufficient to support its finding. While the court formed the basis of its finding by considering both Francisco King Cancino's ("King") and Dominguez's declarations, the finding would stand even if only considering King's declaration. As the court noted, King's deposition, in which he stated "I think" it was a fifteen-day payment period, is not so unequivocal as to establish his later declaration as a sham affidavit. This is particularly true in that

King's later declaration provides testimony as to the fact that invoices were often paid later than fifteen days without assessed penalties. Taking the circumstances and testimony into account, along with the instruction to apply the sham affidavit rule "with great caution," *Bank of Ill.*, 75 F.3d at 1169, the court remains confident that Servicios was not simply attempting to offer a sham issue to avoid summary judgment. Thus, the court finds first that Dominguez's declaration did not run afoul of the sham affidavit rule and, therefore, there is no reason to reconsider the court's earlier finding that a genuine issue of material fact existed regarding the statute of limitations defense. Alternatively, even if the affidavit were a sham, the court's finding would remain the same.

Accordingly,

**IT IS ORDERED** that the defendant's Rule 7(h) Expedited Non-Dispositive Motion for Reconsideration (Docket #99) be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 19th day of April, 2011.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge